United States District Court
Southern District of Texas

**ENTERED**

March 29, 2021

Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **LEOPOLDO VILLA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Case No. 2:19-CV-00256** |
| | § | |
| **TEXAS PARKS AND WILDLIFE** | § | |
| **DEPARTMENT,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM OPINION AND FINAL JUDGEMENT

Leopoldo Villa worked as a maintenance mechanic and boat technician for the Texas Parks and Wildlife Department (the "Department") for over 45 years. In March 2018, the Department fired Villa. The Department found that Villa had failed to adequately perform his job duties and failed to comply with the Department's leave-of-absence policies. Over a year later, Villa filed a lawsuit in Texas state court against the Department alleging that the real reason for his firing was age discrimination in violation of the Texas Commission on Human Rights Act ("TCHRA").[1] (Dkt. No. 1-4). The Department removed the case and the Parties engaged in discovery. The Department now moves for summary judgment. (Dkt. No. 19). After careful review, the Court **GRANTS** the Department's Motion.

---

[1]    Villa also asserted claims for national-origin discrimination and retaliation, presumably under both Title VII of the Civil Rights Act of 1964 and the TCHRA, which provided the basis for the Court's removal jurisdiction. (Dkt. No. 1-4 at 8); *see* 28 U.S.C. § 1441(a) (providing for the district court's removal jurisdiction); 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). Villa has since dismissed all of his federal claims with prejudice pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure, leaving only his state-law age-discrimination claim. (Dkt. No. 35). For the reasons discussed below, the Court elects to exercise pendent jurisdiction over Villa's remaining state-law claim.

# I.      BACKGROUND

Villa held multiple positions with varying degrees of responsibility during his tenure at the Department.[2]  Villa's most recent position, as a Boat Technician IV, required the highest level of technical skill and autonomy.  The Department claims to have ultimately fired Villa for, among other things, failing to perform tasks assigned to him on his work computer and repairs assigned to him on a specific boat (called the "SAFE boat" and used by the Department for special operations).  In its Motion for Summary Judgment, the Department goes even further, contending that Villa's inability to independently use a computer and repair the SAFE boat meant he was not *qualified* to be a Boat Technician IV.  Villa disagrees with some of the Department's specific accusations regarding his abilities, but he generally agrees that he lacked the requisite computer skills and the ability to repair the SAFE boat.  Notwithstanding his concession, he argues that an age-related comment made by his most recent supervisor demonstrates that the Department's real reason for firing him was discriminatory.

## A.      CAREER OVERVIEW

Villa graduated high school in 1968 and was hired by the Department less than a year later as a mechanic's assistant.  (Dkt. No. 19-2 at 7; Dkt. No. 19-6 at 21).  Although he had no formal qualifications or certifications, he performed welding, mechanic, and painting duties.  (Dkt. No. 19-2 at 7).  At some point within the first few years of his employment, Villa was given the official title of "Maintenance Mechanic I" and was tasked with "assist[ing]" shop mechanics in repairs to boats and vehicles.  (Dkt. No. 19-3 at 16).  Villa worked in the maintenance shop for the next twenty years.  (Dkt. No. 19-2 at 8).  He then took a break from the Department altogether to work

---

[2]     Except where noted, this section contains only undisputed facts which have been construed in the favor of the nonmovant, Villa.  *See Scott v. Harris*, 550 U.S. 372, 378, 127 S.Ct. 1769, 1774, 167 L.Ed.2d 686 (2007).

on a scallop boat off the coast of Virginia, where he learned how to "drag for scallop" but did not perform any mechanical duties.  (*Id.*).  After a year, Villa returned to the Department's maintenance shop in his old position.  (*Id.*).

About ten years after his return to the Department, Villa became a Boat/Motor Vehicle Technician II ("Boat Technician II").  (*Id.*).  As such, Villa was tasked with performing "entry level" maintenance of the Department's boats, trailers, and vehicles.  (Dkt. No. 19-6 at 26).  He further worked "under close supervision with limited latitude for exercise of independent judgment." (*Id.*).  As before, Villa had no formal qualifications or training for this position.  (Dkt. No. 19-2 at 8).  After working as a Boat Technician II for a few years, however, the Department sent Villa to a one-week training course tailored specifically for boat technicians.  (*Id.*).  Villa attended this annual training course three times before the Department discontinued it.  (*Id.*).

Villa was eventually promoted to a Boat Technician III.  In that position, he was tasked with "complex and advanced" repairs and maintenance of the Department's boats, trailers, and vehicles.  (Dkt. No. 19-7 at 13).  This position required Villa to keep the Department's equipment in "'a ready to be used' condition to ensure divisional goals and objectives can be met," and to "[m]aintain a working knowledge of [his] assigned area." (*Id.*).  He was further required to "[m]aintain records and files of completed maintenance inspections and repairs." (*Id.*).  Regarding autonomy, Villa was expected to work under "general supervision, with moderate latitude for the use of initiative and independent judgment." (Dkt. No. 19-4 at 18).

In 2004, Villa retired as a Boat Technician III.  (Dkt. No. 19-3 at 6).  Villa came out of retirement just five months later and returned to the Department.  Upon his return, he accepted an offer to be a Boat Technician II, a lesser position than the one from which he had retired.  (*Id.* at 4); (Dkt. No. 19-6 at 26).  And in 2007 he was promoted to his old post as a Boat Technician III.

(Dkt. No. 19-7 at 12). Notably, as a Boat Technician III in 2007, Villa was required to have skills in "using MS Word, Excel and Outlook." (Dkt. No. 19-4 at 19).

In 2011, Villa was promoted to a position he had never held: Boat Technician IV. (Dkt. No. 19-7 at 26). Villa's supervisor at the time of this promotion, Captain Henry Balderamas, noted in his memorandum of recommendation that Villa had been "satisfactorily performing at the level of [Boat Technician IV], including performing the job duties at that level." (*Id.*). Balderamas further noted that Villa, as a Boat Technician III, had "assumed higher level and additional responsibilities in that he now performs more complex repairs on technologically advanced boats, boat motors, and vehicles." (*Id.*). As for formal qualifications, Balderamas stated that Villa "has also received certifications from Mercury Marine showing his progress and proficiency." (*Id.*). By this, Balderamas was referencing the one-week training Villa had received three years in a row when he became a Boat Technician II. (Dkt. No. 19-2 at 11).

But Villa's new responsibilities as a Boat Technician IV differed significantly from his responsibilities as a Boat Technician II. As a Boat Technician IV, Villa was responsible for performing "advanced maintenance" of the Department's boats, vehicles, and trailers. (Dkt. No. 19-6 at 17). Such maintenance was to include, for instance, performing "major overhauls of outboard motors" and "complete 'rig out[s]' of boats (electrical, motor, radios and other accessories)." (*Id.* at 18). Villa's skills were to be so "advanced" in these things that he was meant to "[p]rovide[] guidance to less tenured technicians." (*Id.* at 17). Notably, unlike any of his previous positions, Villa was to perform his work "independently," and he was given complete "latitude for exercise of independent judgment." (*Id.*). Despite these unique aspects of his new role, some expectations were the same as his previous positions. For instance, Villa was expected to maintain the Department's "boats, outboard motors, boat trailers and vehicle in [r]eady to [u]se

4

condition." (*Id.* at 18). He was also to "maintain[] records and files of performed maintenance inspections and repairs," and to have skills in "using MS Word, Excel and Outlook." (*Id.* at 17–19).

Villa held this Boat Technician IV position until he was discharged in March 2018. (Dkt. No. 19-7 at 32). A month prior to his firing, in February 2018, the Department issued Villa a "Letter of Intent" outlining numerous performance issues and leave-policy infractions. (Dkt. No. 19-4 at 57–59). The performance issues identified in the Letter of Intent that are most relevant here concerned his failure to accomplish computer-related tasks and his failure to adequately perform maintenance on the SAFE boat. (*Id.*). The Letter of Intent warned Villa that the Department was "considering taking formal corrective action, up to and including termination," and invited Villa to "provide . . . a detailed reply" before it took any such action. (*Id.* at 57, 59). Villa responded by disputing many of the Department's characterizations of his actions and previous conversations with his supervisor, by pinning the blame for some of the performance mishaps on his supervisor at the time, and by accepting the blame for some of the miscommunications regarding his leaves of absence. (Dkt. No. 19-7 at 28–30). The Department viewed Villa's response to have "demonstrated a lack of willingness to follow directives of his direct supervisor," and therefore fired him. (*Id.* at 31–32). Villa was 69 years-old when he was discharged and was replaced by a male in his early 40s. (Dkt. No. 22-3 at 5).

### B.   VILLA'S COMPUTER SKILLS

Villa began his career with the Department at a time when computers were not widely used. Beginning in the late 1980s, the Department put plans in place to implement a computer program to keep track of its inventory. (Dkt. No. 19-3 at 15). Anticipating this leap forward, Villa's performance evaluation for the period of 1987 to 1988 shows that he and his supervisor set a goal for Villa to "learn computer operations" by attending a basic computer school by May 1989. (*Id.*

5

at 12, 15).  Villa never attended a computer school that following year, or at any point during the rest of his career despite the fact that many of his annual performance evaluations made express reference to his need for computer training.  (Dkt. No. 19-2 at 19–20, 25); (Dkt. No. 19-3 at 19, 23, 32, 39).  That is not to say Villa never *tried* to obtain formal training: Villa once asked Balderamas to have the Department provide him with basic computer class.  But when Balderamas scheduled one, Villa "couldn't go" for some reason that he can no longer recall.  (Dkt. No. 19-2 at 19–20).  The record does not show that Villa tried to reschedule that class during Balderamas's tenure.  Nor does it show that Villa ever sought outside computer training, such as from a local high school or university.  (*Id.* at 20).

Although he never obtained formal computer training, Villa testified that he had accrued some familiarity with computers by 2010—albeit "very little."  (*Id.* at 19).  He managed to do so informally by "ask[ing] questions to other game wardens" about how to operate computers.  (*Id.*).  Still, Villa's computer skills at that time were limited to creating "monthly reports," and he could not use other common workplace applications such as email, Excel, or the internet.  (*Id.* at 20).

Villa's slowly developing computer skills were not viewed as a significant problem by his former supervisor, Balderamas.  In 2013, for instance, when Balderamas nominated Villa for a one-time bonus, he wrote a glowing description of Villa's computer use: "[Villa] has never used a computer until our agency fast-forwarded into the computer age and he has made great strides in his knowledge of our email system, looking up agency policies, and finding information on the internet to assist him with repairing our modern equipment."  (Dkt. No. 19-3 at 41–42).  Despite this fanfare, Villa's deposition testimony shows a different reality.  At that particular point in time, Villa did not have "knowledge of the e-mail system," was not able to "look up agency policies,"

6

and could not "find information on the internet." (Dkt. No. 19-2 at 21–22). Rather, he had merely "started learning" these skills. (*Id.*).

Still, Balderamas's management style included praising signs of progress. In Villa's 2015 annual performance evaluation, for instance, Balderamas gave Villa an "exceeds expectations" score (a four out of five) in the "Continuous Learning/Adaptable to Change" category because Villa had been "expanding" his computer skills. (Dkt. No. 19-3 at 52). Notably, Balderamas's evaluation makes no mention of any advancement in Villa's use of email, looking up agency policies, or the internet—areas identified in previous evaluations as needing improvement—but rather focuses on Villa's ability to enter repair and maintenance records into his computer. (*Id.* at 32, 39, 53). As well, Villa concedes that the reality during this evaluation period was that it still took him "a long time" to perform this lone computer task. (Dkt. No. 19-2 at 34). Nonetheless, he suggests that Balderamas's "exceeding expectations" assessment was accurate because it was accurate "to him," that is, to Balderamas. (*Id.*).

Balderamas retired in 2016, signaling an inflection point in the Department's handling of Villa's computer skills. In November of that year, Captain Brent Tucker filled Balderamas's shoes as Villa's supervisor. As Villa acknowledges, Tucker had specific expectations for Villa's use of a computer. (*Id.* at 47). For example, Tucker wanted all computer work done "right [a]way, quick." (*Id.* at 34). This expectation presented problems for Villa because, he testifies, he simply "didn't have the skills to do it quick." (*Id.*). As well, Villa testifies that Tucker wanted him to do everything on his own without the assistance of others. (*Id.* at 26). Although this expectation fit within Villa's job requirement as a Boat Technician IV to work "independently," Villa admits he could not meet it, as he relied on his coworkers to assist him in entering maintenance records on the computer "about 30 percent of the time." (*Id.* at 25). Villa recalls telling Tucker that he

"need[ed] help with technology" "on several occasions," (*Id.* at 45), and that he was "not very skilled with computer usage." (Dkt. 22-23 at 2–4).

Tucker's opinion of Villa's computer skills differed from Balderamas's. In Villa's performance evaluation for the period of 2016–2017, Tucker gave Villa a "needs improvement" score (two out of five) in the "Continuous Learning/Adaptable to Change" category.[3] (Dkt. No. 19-4 at 10). Tucker further noted that Villa had been "shown, explained [sic], and tasked with growing his skills with change and technology" but was nevertheless "often late accomplishing tasks that relate to technology and computer reporting systems." (*Id.*). In sum, Tucker recognized that Villa, while "a passionate employee that is willing to help anyone at anytime," "need[s] to grow and develop his skills with technology to be an effective member of [the Department]." (*Id.* at 12).

Tucker nonetheless sought ways to help Villa improve his computer skills. For instance, Tucker instructed Villa to handle his computer work completely on his own and no longer rely on coworkers. (Dkt. No. 22-30 at 2); (Dkt No. 19-2 at 47). Although this instruction appears to have frustrated Villa, he recognizes that Tucker simply "wanted [him] to learn how to do [computer tasks] on [his] own." (Dkt. No. 19-2 at 27). Beginning in November 2017, Tucker also provided Villa with a "weekly project planner . . . to help him stay on task and allow weekly communication and track job tasking." (*Id.* at 49, 60, 133, 135); (Dkt. No. 19-4 at 13). Tucker testified that this assignment was, at least in part, meant to help Villa improve his computer skills as "part of on-

---

[3]     The first of Villa's evaluations during Tucker's tenure shows that he received an "exceeds expectations" score (four out of five) in the "Continuous Learning/Adaptable to Change" category. (Dkt. No. 19-4 at 5). Although Tucker signed off on this evaluation, he did so just nine days after assuming his position, on November 10, 2016. (*Id.* at 8). During his in-person review for that performance period with Villa, Tucker made clear that Villa's performance scores on this evaluation—for the period of 2015 to 2016—did not represent Tucker's evaluation, but Balderamas's. (Dkt. No. 22-30 at 1).

the-job training," but also to "track accountability of projects."[4]  (Dkt. No. 19-2 at 133–34); *see also* (Dkt. No. 19-4 at 13).

Tucker's efforts to help Villa develop his computer skills were not effective.  For example, despite Tucker's instruction to the contrary, Villa asked Tucker for the assistance of other employees to complete his computer tasks.  (Dkt. No. 19-2 at 48–49).  Although Tucker denied that request, Villa would regularly seek and receive help from coworkers anyway.  (*Id.* at 48–49); (Dkt. No. 19-4 at 58); (Dkt. No. 19-7 at 42–43).  Tucker's weekly planner assignment also did not fare well, as Villa failed to meet Tucker's deadline to complete the task three weeks in a row. (Dkt. No. 19-4 at 58).

Over a year after Tucker had assumed the position as Villa's supervisor, there was little evidence that Villa's computer skills were improving.  One instance from January 2018—just two months before Villa was fired—is particularly illustrative.  When Tucker confronted Villa about taking a sick day without first notifying Tucker that he was taking the day off, Villa explained that he "just forgot."  (Dkt. No. 19-2 at 50).  Tucker then instructed Villa to memorialize his justification by sending Tucker an *email*.  (*Id.* at 50–51).  A few hours later, Villa sent Tucker his justification, by *text message*.  (*Id.*).  Tucker replied to that text message by asking Villa, again, to send him an email.  (*Id.*).  Villa tried to comply with Tucker's request by resending the same

---

[4]    It is worth noting Villa requested of Tucker to send him to a formal computer training course, and although Tucker asked his supervisor and other captains in the Department if any computer classes were available for Villa, none were located.  (Dkt. No. 19-2 at 134–35).

       Also, although the details are disputed, Tucker claims to have set up computer-skills "training" for Villa with one of the Department's secretaries.  (Dkt. No. 19-4 at 41; Dkt. No. 19-2 at 40).  Villa testified that he understood this training to be meant for only one session and pertain to the completion of just one form.  (Dkt. No. 19-2 at 47, 48).  Tucker learned later that Villa had gone to train with the secretary only once.  (Dkt. No. 19-4 at 41).  Regardless, the Court need not resolve any disputes over the details of these facts in order to rule on this Motion.

information, but once again he sent it through text message. (*Id.*). At that time, Villa testifies, he simply "thought it was an e-[mail]." (*Id.*).

In his deposition testimony, Villa plainly admits that he never developed the ability to independently use computers to the extent necessary to perform all the tasks normally performed by the Department's technicians. (*Id.* at 20, 40). He recognizes that "with computer skills" Villa would have "remain[ed] competitive" in his "job duties and responsibilities." (*Id.* at 35). And although he wanted Tucker to do more to help him, Villa concedes he "had been trying to get those computer skills since 1988 and had not managed to acquire them by 2016." (Dkt. No. 19-2 at 35–36; *see also* Dkt. No. 19-3 at 15, 19, 23, 39; Dkt. No. 19-4 at 10, 12, 13).

### C.   VILLA'S "ADVANCED" SAFE BOAT MAINTENANCE SKILLS

The computer was not the only piece of equipment causing Villa problems at work. Villa struggled to satisfactorily repair and maintain a 38-foot boat called the SAFE boat. The SAFE boat was a relatively sophisticated boat used by the Department's game wardens for special operations. Villa's failure to repair the SAFE boat was one of the Department's primary justifications for firing him. (Dkt. No. 19-4 at 57–58). Specifically, Villa was cited for failing to perform certain repairs and maintenance on the SAFE boat both before and after the SAFE boat malfunctioned while being used by game wardens during a patrol on August 5, 2017. (*Id.* at 57).

In the weeks leading up to the August 5th operation, Tucker had tasked Villa with repairing the collar of the boat. (*Id.*; Dkt. No. 19-2 at 56). Villa failed to perform the task as assigned, and the collar came apart while the wardens were using the boat. (Dkt. No. 19-2 at 56; Dkt. No. 19-4 at 40, 57). Once again, Tucker immediately instructed Villa to repair the collar, and to perform maintenance on one of the SAFE boat's engines. (Dkt. No. 19-4 at 40). Villa asked for and received help from another district's technician in performing the maintenance to the SAFE boat's

engine.  (*Id.*).  It took several weeks for Villa to complete the repairs.  (*Id.*).  According to Tucker, it "should not have taken so long to complete."  (*Id.*).

As for repairing the collar, over the course of the next five months, Tucker "advised, counseled, and coached" Villa on how to complete the task "numerous times," and he also arranged to have another technician help Villa get it done despite the fact that he thought it was something Villa could work on himself.  (*Id.* at 40–44, 57); (Dkt. No. 19-2 at 56–57).  Tucker told Villa that the SAFE boat repairs had to be completed by February 2018 in order for the wardens to use it in another operation.  (Dkt. No. 19-4 at 42); (Dkt. No. 19-2 at 49).  Although Villa was aware that Tucker expected problems to be fixed "immediately," Villa had still not completed the task as of February 2, 2018.  (Dkt. No. 19-2 at 45, 49); (Dkt. No. 19-4 at 57).  Villa was fired from the Department soon after this missed deadline, and, as for the boat collar, "[o]utside sources were required to get started on this project," placing "an undue burden on other Department employees and their work duties in the area of operations."  (Dkt. No. 19-4 at 57).

Aside from this specific incident, Villa's deposition testimony shows that, generally speaking, he was significantly limited in his ability to maintain and repair the SAFE boat.  He admits to having no ability to independently provide "basic repair" of the SAFE boat's diesel engines, no familiarity with the SAFE boat's AC/DC electrical system, no skill in using the SAFE boat's offshore navigation system, no skill at conducting routine maintenance inspections on the SAFE boat, no skill in conducting diagnostic analysis of any malfunctions on the SAFE boat, no ability to conduct a major overhaul of the SAFE boat's outboard motor, and even no skill in preparing, processing, and filing documentation of maintenance inspections and repairs on the SAFE boat.  (Dkt. No. 19-2 at 14, 30, 35).  Yet the job description for a Boat Technician IV plainly required the ability to do all of these things and more.  (Dkt. No. 19-6 at 17–19).  Further, as Villa

acknowledges, he was specifically responsible for repairing the SAFE boat for his district.  (Dkt. No 19-2 at 29).  In sum, not only did Villa lack the ability to independently conduct "advanced" repairs of the SAFE boat, he also had to call other technicians for advice whenever it needed "more than minor mechanic work."[5]  (*Id.* at 9, 13–14, 29).

### D.    TUCKER'S AGE-RELATED COMMENT

On July 17, 2017, a few weeks before the collar came off the SAFE boat during the game wardens' August 5th operation, Tucker commented on Villa's age during a conversation with one of the Department's game wardens, Scott McLeod.  (Dkt. No. 23-1 at 27).  At the time, Tucker and McLeod had been discussing a maintenance plan for the SAFE boat because Tucker wanted McLeod to begin overseeing the SAFE boat's regular maintenance.  In the event McLeod needed advice in carrying out this new duty, Tucker recommended he seek out one of two technicians— neither of whom were Villa, despite the fact that Villa had been performing maintenance on the SAFE boat.  (*Id.* at 22, 24–27).  The following exchange then occurred:

> Capt. Tucker:    So utilize them [the other technicians].  Not talking about Leo in a bad way or anything like that, but *Leo's getting old*.  I mean, it's no joke, no secret anything.
>
> So Leo's getting more forgetful about things and he doesn't necessarily always know and understand the ins and outs of some of that sophisticated stuff on that SAFE boat.
>
> McLeod:          No, you're a hundred percent correct.
>
> Capt. Tucker:    So let's utilize and Leo – he understands.
>
> McLeod:          No, Leo doesn't mind that one bit.

---

[5]    Tucker accommodated Villa's request for help by asking a technician from a different division to come assist Villa in repairing the SAFE boat despite the fact that, as a Boat Technician IV, Villa was expected to perform advanced maintenance work independently.  (Dkt. No. 19-2 at 46); *see also id.* at 131); (Dkt. No. 19-4 at 41).

(*Id.* at 27) (emphasis added).  Aside from this comment, Villa admits that Tucker never told Villa directly that he was "getting too old."  (Dkt. No. 19-2 at 32–33).  Villa also testified that Tucker never told him that "old people" cannot learn how to use a computer.  (*Id.* at 33).

### E.   THE PROCEDURAL HISTORY OF THE CASE

Villa was fired in March 2018.  (Dkt. No. 19-7 at 32).  On August 31, 2018, Villa filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission Civil Rights Division ("TWC") alleging national origin and age discrimination as well as retaliation for engaging in protected activity.  (Dkt. No. 19-1 at 17).  In April 2019, the EEOC dismissed Villa's Charge and issued a right-to-sue letter.  (Dkt. No. 19 at 23).  On July 24, 2019, Villa "requested" that TWC issue a Notice of Right to File a Civil Action.  (Dkt. No. 1-4 ¶ 15).  One day later, on July 25, 2019, Villa filed the instant Complaint against the Department in Texas state court.  (Dkt. No. 1 at ¶ 2).

The Department was served on August 14, 2019, (Dkt. No. 1-4 at 15; Dkt. No. 1 at ¶ 6), and timely removed the case on September 6, 2019, (Dkt. No. 1).  The Department also filed an Answer to Villa's Complaint, asserting among other defenses that Villa "did not timely and adequately exhaust all claims through compulsory administrative remedies; nor did [Villa] satisfy all of the applicable statutes of limitations or other applicable time requirements of the law."  (Dkt. No. 1-4 at 22–23).  After a period of discovery, the Department filed the instant Motion for Summary Judgment.  (Dkt. No. 19).  Villa voluntarily dismissed his national-origin and retaliation claims with prejudice, leaving only his THCRA age-discrimination claim for this Court's review.  (Dkt. No. 35).

## II.   JURISDICTION

Before addressing the merits, the Court must independently assess whether it has jurisdiction to entertain Villa's claim.  *See MidCap Media Fin., LLC v. Pathway Data, Inc.*, 929

F.3d 310, 313 (5th Cir. 2019).  The two relevant issues concern this Court's pendent jurisdiction over Villa's only remaining claim of age-discrimination under state-law and, accepting that, Villa's compliance with the Texas Labor Code's statute of limitations.[6]

### A.   PENDENT JURISDICTION OVER THE THCRA AGE-DISCRIMINATION CLAIM

When a case is removed to federal court, the Court looks to the record in the state court at the time of removal to determine whether federal jurisdiction exists.  *See St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 289–90, 58 S.Ct. 586, 590–91, 82 L.Ed. 845 (1938); *Cavallini v. State Farm Mut. Auto Ins. Co.,* 44 F.3d 256, 264 (5th Cir. 1995).  Villa's original complaint in state court included Title VII national-origin discrimination and retaliation claims, both of which provided the basis for the Court's jurisdiction upon removal.  (Dkt. No. 1-4 at 8); *see* 28 U.S.C. § 1441(a); 28 U.S.C. § 1331.  As a consequence of this original jurisdiction, the Court had supplemental jurisdiction over Villa's state-law age-discrimination claim which, like his federal claims, arose from the Department's discharge of Villa.  *See* 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 345 108 S.Ct. 614, 616, 98 L.Ed.2d 720 (1988) (finding supplemental jurisdiction over state-law claims was appropriate where they "arose from [an employer's] discharge of [the plaintiff-employee]").

---

[6]    Villa did not allege age discrimination under the TCHRA's federal counterpart, the Age Discrimination in Employment Act, 29 U.S.C. § 623.  (Dkt. 1-4 at 8).  But even if he had, the Department, as an entity of the state of Texas, would be immune under the Eleventh Amendment.  *See Chimm v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016) ("[N]either Congress nor Texas have waived Texas's sovereign immunity from ADEA claims . . . .").

Roughly a week before the Joint Pretrial Order deadline, however, Villa dismissed all of his federal claims pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure, leaving only his state-law age-discrimination claim.  (Dkt. No. 35).  Federal courts may elect to exercise pendent jurisdiction over a remaining state-law claim after considering and balancing the statutory factors set forth in 28 U.S.C. § 1367(c) and the common law factors of judicial economy, convenience, fairness, and comity.  *See Enochs v. Lampasas Cty.*, 641 F.3d 155, 159 (5th Cir. 2011) (citing *Carnegie-Melon*, 484 U.S. at 350, 108 S.Ct. at 619).  "The statutory factors are: (1) whether the state claims raise novel or complex issues of state law; (2) whether the state claims substantially predominate over the federal claims; (3) whether the federal claims have been dismissed; and (4) whether there are exceptional circumstances or other compelling reasons for declining jurisdiction.  *Id.* (citing 28 U.S.C. § 1367(c)).

The Court finds that these factors counsel in favor of exercising pendent jurisdiction over Villa's state-law age-discrimination claim.  On the one hand, Villa's age-discrimination claim predominates over the federal claims and those federal claims are now dismissed.  On the other hand, the age-discrimination claim is neither novel nor complex, and there are no exceptional circumstances or other compelling reasons for declining jurisdiction.  Indeed, the opposite is true: at this late stage in the litigation, judicial economy is significantly served by settling the matter in federal court.  Further, it is just as convenient for the Parties to have the matter decided in federal court, as the location of the state court from which it was removed is located in the same vicinity. The Court similarly discerns no lack of fairness or negative impact on comity resulting from a decision to exercise pendent jurisdiction over the state-law claim, and none has been brought to its attention by the Parties.  Accordingly, on balance, the factors weigh in favor of exercising pendent jurisdiction over Villa's THCRA age-discrimination claim, and the Court elects to do so.

### B.    COMPLIANCE WITH TEXAS STATUTE OF LIMITATIONS

Texas law requires that a TCHRA complaint "be filed not later than the 180th day after the date the alleged unlawful employment practice occurred."   TEX. LAB. CODE § 21.202(a). Importantly, whenever a Texas governmental entity is sued under the TCHRA, this 180-day limitation is a jurisdictional requirement.  TEX. GOV'T CODE § 311.034 ("Statutory prerequisites to a suit . . . are jurisdictional requirements in all suits against a governmental entity."); *see also Prairie View A&M Univ. v. Chatha*, 381 S.W.3d 500, 514 (Tex. 2012) ("section 21.202's administrative filing requirement is a mandatory statutory requirement that must be complied with before filing suit, and, as such, is a statutory prerequisite under section 311.034").  Because the Department is a "governmental entity" of Texas, the exact number of days between the date Villa was *informed* of his termination and the date he *filed* his Charge with the TWC is significant to the Court's jurisdiction to entertain his Texas law claims.   *See Specialty Retailers, Inc. v. DeMoranville*, 933 S.W.2d 490, 493 (Tex. 1996) ("The limitations period begins when the employee is informed of the allegedly discriminatory employment decision, not when that decision comes to fruition.").

Villa filed his Charge with the TWC on August 31, 2018.  (Dkt. No. 1-4 at 25).  Based on that filing date, the Court would have jurisdiction under the laws of Texas to review Villa's TCHRA claims only if he was informed of his termination no more than 180 days prior, that is, on or after March 4, 2018.  Villa alleges that the relevant dates of discrimination were "February 2018 and March 1, 2018 and March 7, 2018."  (Dkt. No. 19-1 at 24).  Only the March 7 date falls within the 180-day window.  Villa states in his Complaint that on March 7 he received a memorandum from Tucker notifying him of his termination.  (Dkt. No. 1-4 at ¶ 28).  In Villa's TWC Charge, he provides conflicting information, stating that he received a memorandum notifying him of his

termination on March 8, 2018.[7]  (*Id.* at 26).  Although the Department asserted in its Answer that Villa had failed to satisfy all the applicable statutes of limitation, (*id.* at 22–23), the Department does not specifically dispute Villa's assertion that he was informed of that decision a week later on March 7, a conclusion that flows naturally from the fact that the recommendation to discharge Villa was not approved until March 5, 2018.  (Dkt. No. 19-7 at 31).

The Court finds that, for the purposes of Villa's claims under the TCHRA, Villa was notified of the Department's adverse action against Villa on March 7, 2018.  Because March 7, 2018 falls within Texas's 180-day window for filing a complaint to the TWC, the Court has jurisdiction to consider Villa's Texas law claims against the Department.

## III.    DISCUSSION

Summary judgment is proper wherever the record presents "no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a). The record presents no genuine dispute of fact if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).  That is, a genuine dispute exists only where "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *see also id.* at 249–50, 106 S.Ct. at 2511 (stating that summary judgment is appropriate if "the evidence is merely colorable or is not significantly probative" (internal citations

---

[7]    The Department is not clear as to which date it alleges Villa was fired.  In its Motion for Summary Judgment, the Department refers generally to "March 2018" as the date of Villa's termination.  (Dkt. No. 19 at 7, 21, 30).  Elsewhere in its Motion, the Department identifies "March 1, 2018" as a date relevant to the end of Villa's tenure.  (*Id.* at 16).  As for the record itself, Major Chad Jones (Captain Tucker's supervisor) submitted his "Request for Formal Corrective Action" recommending that Villa be terminated on March 1, 2018.  (Dkt. No. 19-7 at 31).  That same form, however, was not officially "approved" by the Director of the Law Enforcement Division until March 5, 2018.  (*Id.*).

omitted)).  Wherever there is an "actual controversy," that is, "when both parties have submitted evidence of contradictory facts," *Antoine v. First Student, Inc.*, 713 F.3d 824, 830 (5th Cir. 2013) (internal quotation omitted), the Court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party, *Scott v. Harris*, 550 U.S. 372, 378, 127 S.Ct. 1769, 1774–75, 167 L.Ed.2d 686 (2007).  The movant is entitled to judgment as a matter of law if the nonmoving party fails to establish an essential element of his case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  But the nonmovant "cannot satisfy this burden merely by denying the allegations in the opponent's pleadings . . . ." *Donaghey v. Ocean Drilling & Expl. Co.*, 974 F.2d 646, 649 (5th Cir. 1992).  Rather, it must tender "depositions, affidavits, and other competent evidence to buttress its claim."  *Id.*

A.    EVIDENTIARY DISPUTES

As a preliminary matter, the Parties seek to confine the scope of the summary judgment record through motions to strike certain evidence.  (Dkt. No. 22 at ¶¶ 1–9); (Dkt. No. 25 at 7–10).  The Court addresses each Party's objections in turn.

1.    Villa's Objections

Villa moves to strike statements provided by four employees of the Department.  (Dkt. No. 22 at ¶¶ 1–9); *see* (Dkt. No. 19-7 at 34–47 (statements of Scott McLeod (allegedly), Kevin Fagg, Elizabeth Myers, and William Paul Zappe)).  The Court construes these requests as objections to the summary judgment evidence submitted by the Department under Rule 56(c)(2) of the Federal Rules of Civil Procedure.[8]  Only one of his objections is relevant to this Motion.  Namely, Villa objects to the entire "interview summary" of one of his coworkers, Elizabeth Myers, which was submitted by the Department along with its Motion.  (Dkt. No. 22 at 1–2); (Dkt. No. 19-7 at 40–

---

[8]    Rule 56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  FED. R. CIV. P. 56(c)(2).

44).  Villa asserts that Myers's entire interview summary is "nothing more than bare allegations of fact, conclusory facts or legal conclusions involving her relations with a co-worker, Scott McLeod." (Dkt. No. 22 at 2).  In other words, Villa's objection to Myers's interview summary is based exclusively on her statements involving McLeod.

The Court finds Villa's objection insufficient to disregard the entirety of Myers's statement.  The only portion of Myers's interview that is relevant for this Court's analysis concerns Myers's interactions with Villa, not McLeod.  In particular, Myers stated that, although Villa "told [her] that Captain Tucker told him that he could not allow anyone to help him with his reports on the computer," she "continued to help [Villa] with his reports[] because [she] saw him as a partner who needed a little bit of assistance."  (Dkt. No. 19-7 at 42–43).  This statement is neither "bare" nor "conclusory" as it details one coworker's witness to facts provided throughout the record— such as in Villa's own deposition—regarding Villa's continued reliance on coworkers to complete his computer reports.  Accordingly, Villa's objection to Myers's interview summary as it relates to this specific statement is overruled.

The Court finds it unnecessary to rule on the rest of Myers's statement and Villa's objections to the statements from three other Department employees because the Court has considered the Department's Motion without weighing this evidence.  Accordingly, the Court overrules Villa's objections to these statements.  *See Mission Toxicology, LLC v. Unitedhealthcare Ins. Co.*, ___ F. Supp. 3d ____, 2020 WL 6491661, at *3 (W.D. Tex. Nov. 4, 2020) (denying motions to strike as "unnecessary at this juncture").

## 2.     **The Department's Objections**

The Department moves to strike portions of an affidavit submitted by Villa as an exhibit to his Response.  (Dkt. No. 25 at 7–10).  The Department asserts that Villa's affidavit contains statements that contradict his prior deposition testimony as it pertains to his ability to perform the

essential functions of his job. (*Id.* at 7–9). The Court agrees that, insofar as Villa has attempted to impeach his prior testimony, those portions of his affidavit should be struck.

Villa's affidavit states that, after returning "in 2004," he "kept records of jobs in a timely manner and inventory of items on a daily basis, and, "in 2014, [he] was able to use the computer system . . . proficiently." (Dkt. No. 22-3 at 2). These statements contradict material parts of his deposition testimony regarding his use of a computer and skill set, *see, e.g.*, (Dkt. No. 19-2 at 22, 40), and have prompted the Department's objection. (Dkt. No. 25 at 7–9).

"Under the sham affidavit doctrine, a district court may refuse to consider statements made in an affidavit that are so markedly inconsistent with a prior statement as to constitute an obvious sham." *Winzer v. Kaufman Cty.*, 916 F.3d 464, 472 (5th Cir. 2019) (quotations omitted); *see also Axxiom Mfg., Inc. v. McCoy Invs., Inc.,* 846 F. Supp. 2d 732, 749 (S.D. Tex. 2012) (Rosenthal, J.) (explaining that a "sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment" (quoting *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 269 (3d Cir. 2010))). This rule supports the principle that "a nonmoving party may not manufacture a dispute of fact merely to defeat a motion for summary judgment." *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000). "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting the affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* (quotation omitted).

At the same time, "not every discrepancy in an affidavit justifies a district court's refusal to give credence to competent summary judgment evidence." *Winzer*, 916 F.3d at 472 (quotation omitted). As another court in the Southern District of Texas has explained:

> An affidavit or declaration that contradicts prior deposition testimony should not automatically be disregarded. Rather, the court should consider "if sufficiently persuasive reasons are given [for the change in testimony], if the proposed amendments truly reflect the original deponent's original testimony, or if other circumstances satisfy the court that amendment should be permitted."

*Axxiom Mfg.*, 846 F. Supp. 2d at 750 (alteration in original) (quoting *EBC*, 618 F.3d at 270).

Villa's claims in his affidavit that he performed his duties on a computer "in a timely manner" and "proficiently" contradict his previous testimony, and as a result, the Court strikes those statements under the sham affidavit rule. These statements are so markedly inconsistent with his prior statements as to constitute an obvious sham. *See Winzer*, 916 F.3d at 472. Furthermore, Villa has provided no sufficiently persuasive reason for any change in his testimony, the changes do not reflect his original testimony, and no other circumstances convince the Court that his affidavit statements should be permitted. *See Axxiom Mfg.*, 846 F. Supp. 2d at 750. The Court finds that those inconsistencies have not been adequately explained and should therefore be stricken from the summary judgment record.[9]

### B.  TCHRA AGE-DISCRIMINATION CLAIM

Turning now to the merits, Villa claims that the Department discharged him because of his age in violation of the TCHRA. (Dkt. No. 1-4 at 8). In Texas, "an employer may not discriminate against or discharge an employee based on . . . 'age.'" *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588,

---

[9]   Notably, Villa's affidavit repeats his deposition testimony that he "needed some assistance" to perform his duties on the SAFE boat. (Dkt. No. 22-3 at 2, 9).

     The Department also moves to strike a statement in Villa's affidavit that he was able to perform "advanced repair[s]" on certain equipment. (Dkt. No. 25 at 9). But Villa's concession that he needed help with the SAFE boat demonstrates that, however "advanced" his other mechanical skills might have been, they were undisputedly insufficient as applied to the SAFE boat. As explained below, the only of Villa's alleged mechanical deficiencies the Court relies upon to rule on the Department's Motion are those pertaining to the SAFE boat. The Court therefore denies as unnecessary the Department's motion to strike insofar as it relates to Villa's statement about his advanced repair skills. *See Mission Toxicology*, ___ F. Supp. 3d ____, 2020 WL 6491661, at *3.

21

592 (Tex. 2008) (quoting TEX. LAB. CODE § 21.051).  To establish a TCHRA age-discrimination

claim, a plaintiff must show that age was "a motivating factor" for the adverse employment action

taken by the defendant.[10]  *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001);

*see also Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 474–75 (5th Cir. 2015).  A plaintiff

may prove age discrimination through direct or indirect evidence.  *See Reed v. Neopost USA, Inc.*,

701 F.3d 434, 441 (5th Cir. 2012).  Here, Villa attempts to establish age discrimination by

presenting both types of evidence.

### 1.    Direct Evidence Analysis

The direct evidence relied on by Villa is Tucker's remark to Game Warden McLeod in July

2017 that Villa was "getting old."  (Dkt. No. 22 at 24; Dkt. No. 23-1 at 27).  The Department

contends that this comment was nothing more than a "stray remark" and thus irrelevant to Villa's

ultimate termination.  (Dkt. No. 25 at 11–14).  The Court agrees with the Department.

Potentially discriminatory comments in direct evidence cases must meet a "demanding

standard" because the plaintiff "relies on them to prove the entire case of discrimination."

*McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 457 (5th Cir. 2019)

(quotation omitted).  That is, any age-related comments put forward as direct evidence of

discrimination must be more than "stray remarks."  *E.E.O.C. v. Tex. Instruments Inc.*, 100 F.3d

1173, 1181 (5th Cir. 1996).  "To rise above the level of a stray remark, an age-related comment

must 'be direct and unambiguous, allowing a reasonable jury to conclude without any inferences

---

[10]    Although Texas courts generally "look to federal law to interpret the [TCHRA's] provisions," *Autozone*, 272 S.W.3d at 592, the federal ADEA and Texas's TCHRA diverge when it comes to the issue of causation.  *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 440 (5th Cir. 2012).  Whereas the ADEA requires a plaintiff to prove that age was the "but-for" cause of the adverse employment action, *id.*, the TCHRA requires a plaintiff to demonstrate that age was "a motivating factor" in the adverse employment action. *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001).

or presumptions that age was an impermissible factor in the decision to terminate the employee.'"
*McMichael*, 934 F.3d at 457 (quoting *Tex. Instruments*, 100 F.3d at 1181).

The Fifth Circuit has outlined a four-part test to determine whether a comment is direct
evidence of age discrimination. A comment is sufficient to prove age discrimination when it is (1)
age related, (2) proximate in time to the employment decision, (3) made by an individual with
authority over the employment decision at issue, and (4) related to the employment decision at
issue. *See McMichael*, 934 F.3d at 457; *Reed*, 701 F.3d at 441 (applying the four-part test in the
TCHRA context). The Parties do not dispute that Tucker's comment was age related or that Tucker
had authority over Villa's ultimate termination. Rather, the Department disputes the second and
fourth prongs, asserting that Tucker's remark was not made proximate in time to his decision to
terminate Villa and that, regardless, the remark was unrelated to the termination decision. (Dkt.
No. 25 at 13).

Regarding proximity, the Fifth Circuit has made clear that an age-related comment need
not be made in the "direct context of the termination" to be considered as direct evidence of
discrimination. *McMichael*, 934 F.3d at 457 (quotation omitted). On the other hand, the Fifth
Circuit has found comments made almost a year before the adverse employment action in question
to be too far removed to serve as direct evidence of discrimination. *See Jackson v. Cal-Western
Packaging Corp.*, 602 F.3d 374, 380 (5th Cir. 2010) (finding no direct evidence of age
discrimination from an employer's alleged comment that the plaintiff is an "old, gray-haired fart"
because it occurred "almost a year before" the plaintiff's termination); *Auguster v. Vermillion
Parish Sch. Bd.*, 249 F.3d 400, 404–05 (5th Cir. 2001) (finding no direct evidence of discrimination
from a school district superintendent's comment that school had "a problem . . . with past black
coaches, and if there was another problem, no matter what it was, that he would do his best to get

rid of [the plaintiff], from day one," because the comment was made "nearly a year" before the adverse employment action).

In this case, Tucker's age-related comment to McLeod about Villa occurred on July 17, 2017, over seven and a half months before Villa was discharged. Although this length of time is shorter than in *Jackson* and *Auguster*, the Court finds that Tucker's remark was insufficiently proximate in time to the adverse action to serve as direct evidence of age discrimination. Indeed, a significant number of events relevant to the Department's actual justifications for firing Villa had not occurred, such as his handling of the SAFE boat's repairs after the August 5, 2017 collar incident or his demonstrated inability to comply with Tucker's weekly computer reporting tasks which were first assigned to Villa in November 2017.

But even if Tucker's comment was sufficiently proximate to Villa's termination, the comment was not related to the Department's ultimate decision to fire Villa. *See Auguster*, 249 F.3d at 405–06. Villa argues that Tucker's comment is related to his firing because it occurred during a discussion regarding the SAFE boat's "maintenance plan." (Dkt. No. 22 at 31). But the Department in its Letter of Intent did not cite Villa for failing to adequately keep up with the SAFE boat's maintenance plan; rather, the Letter outlined incidences in which Villa was "directed" to perform specific maintenance repairs *related to the August 5th incident* but was unwilling or unable to do so independently (in addition to citing him for numerous other performance and leave-policy infractions). Thus, any relation between Tucker's age-related comment (which occurred prior to the August 5th incident) and Villa's ultimate firing would require an inference that Tucker's improper association between Villa's age and his failure to keep up with the SAFE boat's maintenance plan impermissibly tainted Tucker's view of Villa's failure to follow specific orders to repair the SAFE boat months later. *See Scott v. U.S. Bank Nat'l Ass'n*, No. 3:20-CV-2380-G,

2020 WL 7388601, at *5 n.6 (N.D. Tex. Dec. 16, 2020) ("A supervisor's mere mention of an employee's protected characteristic in proximity to an adverse employment decision does not amount to direct evidence of the kind required by Title VII.  At best, such comments require an inference of the relationship between the racial remark and the adverse employment decision."). In his Letter of Intent, Tucker could have but did not state that his transfer of responsibility for the SAFE boat's maintenance plan to McLeod affected his decision to recommend Villa's termination. The Court may not presume that he meant to say so but did not.

Accordingly, the Court finds that a reasonable jury could not conclude without any inferences or presumptions that age was an impermissible factor in the decision to terminate Villa based solely upon Tucker's age-related comment.  *See McMichael*, 934 F.3d at 457.  Thus, that comment was a "stray remark."  *Id.*  Villa has therefore presented no direct evidence sufficient to preclude summary judgment.

### 2. Indirect Evidence of Age Discrimination

Villa also contends that indirect (or circumstantial) evidence of age discrimination supports his claim.  The Department counters by asserting that Villa cannot make a *prima facie* case of age discrimination because he was not qualified for the Boat Technician IV position.  The Court agrees.

When considering indirect evidence in discrimination cases, courts use the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  *See McMichael*, 934 F.3d at 456.  This framework first requires a plaintiff to establish a *prima facie* case of discrimination.  *Berquist v. Wash. Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007).  If the plaintiff is successful in doing so, the burden shifts to the employer to articulate a "legitimate, non-discriminatory reason for the employment decision."  *Id.*  If the employer articulates such a reason, the plaintiff may overcome summary judgment only by demonstrating that the employer's purported explanation is a "pretext" for, in this case, age discrimination.

*McMichael*, 934 F.3d at 456.  The Parties dispute whether Villa can satisfy the first step of establishing a *prima facie* case of age discrimination.

### *Prima Facie Case*

A plaintiff seeking to establish a *prima facie* case of age discrimination under the TCHRA where he is replaced by someone else must show that he was (1) a member of the protected class under the TCHRA (*i.e.* at least forty years old), (2) qualified for his employment position, (3) terminated by the employer, and (4) was either (a) replaced by someone significantly younger or (b) otherwise treated less favorably than others who were similarly situated but outside the protected class.  *Texas Tech Univ. Health Scis. Ctr.-El Paso v. Flores*, 612 S.W.3d 299, 305 (Tex. 2020); *see also* TEX. LAB. CODE § 21.101.  Here, there is no dispute that Villa was discharged, was a member of a class protected by the TCHRA and was replaced by someone significantly younger. (Dkt. No. 19-7 at 32; Dkt. No. 22-3 at 5).  The Parties disagree as to whether Villa can satisfy the second prong of the *prima facie* test, that is, whether he was qualified for his position as a Boat Technician IV.

A plaintiff seeking to establish that he was qualified in an age-discrimination case must show that "he *continued* to possess the necessary qualifications for his job *at the time* of the adverse action."  *Kaplan v. City of Sugar Land*, 525 S.W.3d. 297, 304 (Tex. App. – Houston 2017, no pet.) (emphasis added) (quoting *Bienkowski v. Am. Airlines, Inc*., 851 F.2d 1503, 1506 (5th Cir. 1988)). Even if the evidence demonstrates that a plaintiff's employer was "not pleased with his performance, this evidence does not prove a lack of qualifications at the *prima facie* stage." *Berquist*, 500 F.3d at 350–51.  Rather, a plaintiff may simply show that he "had not suffered physical disability or loss of a necessary professional license or some other occurrence that rendered him unfit for the position for which he was hired."  *Id.* at 351 (quoting *Bienkowski*, 851

F.2d at 1506 & n.3). This standard is "consistent with the minimal nature of a *prima facie* case" and focuses on "the employee's *bare ability to do the work*, not the quality of the work done." *Kaplan*, 525 S.W.3d at 304–05 (emphasis added) (quotation omitted). In other words, the "qualified" inquiry focuses on the employee's "objective job qualifications (*e.g.,* training, experience, and physical capacity)." *Wooten v. McDonald Transit Assoc., Inc.*, 788 F.3d 490, 499, n.7 (5th Cir. 2015); *see also Berquist*, 500 F.3d at 349 (accepting the employee's testimony that he "met the objective criteria listed in a job posting" at the time of hire as evidence that the employee was qualified).

The Department contends that Villa was unqualified for his position as a Boat Technician IV because of his lack of computer skills and inability to independently perform advanced repairs on the SAFE boat. (Dkt. No. 19 at 8). To support its argument, the Department points to Villa's many admissions to having skill deficits during his deposition. (*Id.* at 11–16). In response, Villa alleges he was qualified for his position because he possessed skills in "effective communications [sic]" and "advanced" boat repairs. (Dkt. No. 22 at ¶¶ 70–71). For support, he relies almost exclusively upon the opinion of his former supervisor, Captain Balderamas, as expressed in Balderamas's memorandum recommending Villa's promotion to Boat Technician IV in 2011, Villa's annual performance evaluations under Balderamas during his time as a Boat Technician IV, and an affidavit submitted by Balderamas to the Court. (*Id.* at ¶¶ 61–69). Villa also relies on his deposition testimony wherein he asserts, basically, that he had the skills to handle advanced repairs on all boats—that is, except for the SAFE boat. (*Id.* at 16–22).

Nonetheless, the undisputed facts demonstrate Villa was not qualified for the position of Boat Technician IV. Putting aside the Department's dissatisfaction with Villa's performance immediately prior to his termination, *see Berquist*, 500 F.3d at 350–51, Villa cannot show that he

"continued" meeting the "objective" job criteria for a Boat Technician IV. *Kaplan*, 525 S.W.3d at 304; *Wooten*, 788 F.3d at 499 n.7; *see also Berquist*, 500 F.3d at 349. As it pertains to both his computer skills and ability to repair the SAFE boat, Villa freely admits that he never met the objective criteria in the job description in the first place. *Cf. Paulissen v. MEI Tech., Inc.*, 942 F. Supp. 2d 658, 665 (S.D. Tex. 2013) (concluding that the plaintiff-employee satisfied the qualification prong only after finding that "there is no dispute that plaintiff was qualified for the position of Controller *when she was hired*" (emphasis added)).

Indeed, as it pertains to computer skills, the objective criteria of the Boat Technician IV position required Villa to be able to "independently" "maintain[] records and files of performed maintenance inspections and repairs" and have skills in "using MS Word, Excel and Outlook." (Dkt. No. 19-6 at 17–19). Yet in his deposition Villa concedes that he "did not possess or acquire the knowledge of computers to adequately perform the job" and that he never quit the habit of seeking help from his coworkers to complete his required computer tasks. (Dkt. No. 19-2 at 40, 48–49).

As it pertains to his ability to maintain and repair the SAFE boat, the objective criteria of the Boat Technician IV position required Villa to "independently" perform "advanced" maintenance, such as overhauling the SAFE boat's outboard motor and conducting diagnostic analysis of any malfunctions. (Dkt. No. 19-6 at 17–19). Yet Villa admits that he lacked the ability to provide even "basic repair" of the SAFE boat's diesel engine on his own, perform the necessary diagnostic analysis, or care for the SAFE boat in a number of other ways that were objectively required of him. (Dkt. No. 19-2 at 9, 13–14, 29–30, 35). Accordingly, Villa's own testimony demonstrates that he did not possess the "bare ability to do the work" required of him as articulated

in his objective job description upon hire. *Kaplan*, 525 S.W.3d at 305; *Wooten*, 788 F.3d at 499 n.7.

None of the evidence relied on by Villa to contend he was qualified to work as a Boat Technician IV is sufficient to overcome his clear testimony demonstrating he was not. Villa points to evidence showing his progress with computers and his competency in maintaining most of the Department's equipment. But it is undisputed that he never possessed the requisite skills to *fully* and *independently* perform his duties on a computer or with the SAFE boat in particular. (Dkt. No. 19-2 at 40). To be sure, the record shows a difference of opinion as to Villa's qualifications and performance between his former supervisor, Balderamas, and his latter supervisor, Tucker. But the Court need not resolve that difference of subjective opinion in order to determine whether Villa was objectively qualified for the position he held. Rather, the Court is tasked with weighing objective evidence, such as the Department's printed job description for a Boat Mechanic IV and Villa's admissions in his deposition that he never met the qualifications of his job. *Cf. Berquist*, 500 F.3d at 349–50 (accepting the plaintiff's testimony that he satisfied the objective criteria listed in a job posting and finding that he "possessed the same job qualifications when [the employer] terminated him as when [the employer hired him]"). Thus, in this particular case, it is irrelevant that Villa met the expectations of a prior supervisor in performance reviews, or that he was capable of performing most but not all of his expected duties. Having conceded his uncured skill deficits, Villa cannot persuade a reasonable jury that he was fully qualified under the Department's objective rubric for a Boat Technician IV.

In sum, because Villa was unqualified for his position as a Boat Technician IV, he cannot establish a *prima facie* case of age discrimination. After viewing the entire record, the Court

concludes that there is no genuine dispute of material fact on this issue.  The Department is therefore entitled to summary judgment on Villa's age-discrimination claim.

### *Legitimate, nonretaliatory reason for termination*

Assuming that Villa has established a *prima facie* case of age discrimination, the burden now shifts to the Department to articulate its legitimate, nonretaliatory reasons for the adverse action.  *Aldrup v. Caldera*, 274 F.3d 282, 286 (5th Cir. 2001).  The Department states that Villa was discharged because of performance issues, insubordination, inadequate job knowledge and taking leave without approval.  (Dkt. No. 19 at 16–20, 23).  This is sufficient to satisfy its burden of production.  *See Hudgens v. Univ. of Tex. MD Anderson Cancer Ctr.*, 615 S.W.3d 634, 643 (Tex. App. – Houston Div. 2020) (finding a hospital satisfied its burden by producing evidence that an employee was terminated for "unacceptable work performance"); *Valichkofsky v. L.T. Floors, L.P.,* No. A-06-CA-960-SS, 2007 WL 9710275, at *3 (W.D. Tex. Dec. 17, 2007) ("not performing the duties" of the position and insubordination), *aff'd sub nom. Valichkofsky v. LT Floors LP,* 293 F. App'x 297 (5th Cir. 2008).

### *Evidence of Pretext*

Because the Department has articulated legitimate, nondiscriminatory reasons, the burden now shifts to Villa to present sufficient evidence for a reasonable jury to conclude that the Department's reasons were a pretext for age discrimination.  *Manora v. Donahoe*, 439 F. App'x 352, 357 (5th Cir. 2011).  A plaintiff may establish pretext by showing that the employer's proffered reasons are "false or 'unworthy of credence.'" *Laxton v. Gap Inc.,* 333 F.3d 572, 578 (5th Cir. 2003) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000)).  "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action."  *Id.*  "In a case in which the employer has

articulated a rational justification for terminating an employee, and the facts supporting that justification are not seriously disputed, the task of proving pretext becomes quite difficult." *Price v. Wheeler*, 834 F. App'x 849, 858 (5th Cir. 2020) (quoting *Chaney v. New Orleans Pub. Facility Mgmt., Inc.,* 179 F.3d 164, 168 (5th Cir. 1999)).

In this case, as explained above, Villa does not seriously dispute that he had performance issues, was *never* able to perform certain job duties, and had taken leave without approval.  (Dkt. No. 19-2 at 14, 30, 35–36); (Dkt. No. 19-7 at 28–30).  Accordingly, the task of proving pretext becomes quite difficult.  To meet this high bar and establish pretext, Villa relies on the good performance reviews he had received from his prior supervisor, Balderamas, and the remark made by Tucker, "[Villa's] getting old."  (Dkt. No. 22 at 24; Dkt. No. 23-1 at 27).

To start, the fact that Villa received good performance reviews from a prior supervisor does not establish that a subsequent supervisor was motivated by age discrimination in finding to the contrary.  It is not uncommon for one supervisor to be pleased with the quality of an employee's work while another supervisor is not.  That is particularly true when a previous supervisor did not insist that the employee perform all of the essential functions of the job, but a subsequent supervisor does.  *See e.g., Baig v. McDonald*, 749 F. App'x 238, 241 (5th Cir. 2018) ("The fact that Baig's previous supervisor had allowed Baig to work a different schedule during Ramadan does not mean that the new supervisor 'discriminated' against him when, in lieu of giving an accommodation, the supervisor followed strict policy, which allowed leave if pre-requested."); *Valichkofsky*, 2007 WL 9710275, at *3 (Plaintiff had "several clashes with her new supervisor," and complained about her new supervisor's "management style").  The fact that Balderamas was more forgiving or willing to overlook the fact that Villa was not performing all of the essential functions of his job does not bind Balderamas's successor.  Villa admitted that he could not

31

perform all of the functions of Boat Technician IV and that he took leave without approval.  (Dkt. No. 19-2 at 14, 25, 30, 34–36, 46, 131); (Dkt. No. 19-4 at 41); (Dkt. No. 19-7 at 28–30); *see also* (Dkt. No. 19-6 at 17–19).  While Balderamas might have overlooked Villa's performance issues, Tucker was not required to follow suit.

As discussed previously, the Court has found that the comment made by Tucker was a stray remark.  "Stray remarks" rejected as direct evidence, while insufficient to defeat summary judgment on their own, may still be used to demonstrate pretext or be offered as additional circumstantial evidence alongside other discriminatory conduct.  *Goudeau v. Nat'l Oilwell Varco, L.P.,* 793 F.3d 470, 475–76 (5th Cir. 2015).  However, "[s]tray remarks are insufficient to enable a claim to survive summary judgment when a plaintiff fails to produce substantial evidence of pretext."  *Davis v. RealPage, Inc.,* No. 3:18-CV-0986-D, 2020 WL 1325201, at *15 (N.D. Tex. Mar. 20, 2020) (citing *Read v. BT Alex. Brown, Inc.,* 2002 WL 22060, at *4 (N.D. Tex. Jan. 7, 2002) (citing *Auguster v. Vermilion Parish Sch. Bd.,* 249 F.3d 400, 404–05 (5th Cir. 2001)), *aff'd,* 72 Fed. App'x. 112 (5th Cir. 2003)).  Stated differently, stray remarks without any other evidence of pretext are insufficient to raise a fact issue of discrimination.  *See Katseanes v. Time Warner Cable, Inc.,* 511 F. App'x 340, 346 (5th Cir. 2013) ("We have held that stray remarks 'standing alone' are insufficient to create fact disputes.") (citing *Jackson*, 602 F.3d at 380).  In this case, Villa is unable to point to any other viable evidence that Tucker was motivated by age when making the decision to fire him.  This is unsurprising given that Villa had conceded some of the legitimate nondiscriminatory reasons for firing him that were proffered by the Department.

In light of the foregoing, Villa has failed to demonstrate that the Department's proffered reasons are false or unworthy of credence.  *Laxton,* 333 F.3d at 578.  After viewing the entire record, the Court concludes that Villa has failed to establish a genuine issue of material fact as to

whether the Department's reasons for firing him were a pretext for age discrimination.   The Department is therefore entitled to summary judgment on Villa's age-discrimination claim for this additional and alternative reason.

## IV.   CONCLUSION

The Department's Motion with regard to Villa's THCRA age-discrimination claim is **GRANTED**.

**This is a FINAL JUDGMENT.**

SIGNED this March 27, 2021.

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**